Kelley A. JACKELEN and Peter Jackelen,
Plaintiffs,

PROGRESSIVE CASUALTY INSURANCE COMPANY,
Involuntary Plaintiff,

v.

Hope L. RUSSELL, Defendant-Co-Appellant,

THE HERTZ CORPORATION, Defendant-Appellant,

ALLSTATE INSURANCE COMPANY,
Defendant-Respondent,

ARTISAN AND TRUCKERS CASUALTY COMPANY,
Defendant.

Kelley A. JACKELEN and Peter Jackelen,
Plaintiffs,

PROGRESSIVE CASUALTY INSURANCE COMPANY,
Involuntary Plaintiff,

v.

Hope L. RUSSELL and The Hertz Corporation,
Defendants,

ALLSTATE INSURANCE COMPANY,
Defendant-Respondent,

ARTISAN AND TRUCKERS CASUALTY COMPANY,
Defendant-Appellant.

Court of Appeals

*Nos. 2014AP1883, 2014AP2109. Submitted on briefs August 3, 2015.—Decided November 24, 2015.*

2015 WI App 93

(Also reported in 873 N.W.2d 265.)

258

On behalf of the defendant-appellant, The Hertz Corporation, the cause was submitted on the briefs of *Michael J. Cieslewicz* and *Casey M. Kaiser* of *Kasdorf, Lewis & Swietlik, S.C.*, Milwaukee.

On behalf of the defendant-co-appellant, Hope L. Russell, the cause was submitted on the briefs of *Eric S. Darling* and *Benjamin E. Reyes* of *Schmidt, Darling & Erwin*, Milwaukee.

On behalf of the defendant-appellant, Artisan and Truckers Casualty Company, the cause was submitted on the briefs of *Ward I. Richter*, *Sheila M. Sullivan*, and *David G. Ress* of *Bell, Moore & Richter, S.C.*, Madison.

On behalf of the defendant-respondent, Allstate Insurance Company, the cause was submitted on the briefs of *Michael R. Vescio*, Milwaukee.

Before Curley, P.J., Brennan, J., and Daniel L. LaRocque, Reserve Judge.

¶ 1. CURLEY, P.J. The Hertz Corporation (Hertz), Hope L. Russell, and Artisan and Truckers Casualty Company (Artisan) (collectively, "the appealing parties") appeal the trial court's ruling and entry of final judgment in favor of Allstate Insurance Company

259

(Allstate) on Allstate's motion for declaratory and summary judgment seeking a determination that there is no insurance coverage under its policy because the non-owned vehicle involved in the accident was regularly available for the Russells' use.[1] The appealing parties argue that: (1) the trial court incorrectly concluded that the non-owned vehicle was regularly available for Hope Russell's use, therefore precluding coverage under the Allstate policy; and (2) the Allstate "drive other car" exclusion is not a valid exclusion because it does not comply with WIS. STAT. § 632.32(5)(j) (2009–10).[2] We conclude that the exclusion does not preclude coverage, and we therefore reverse.

## BACKGROUND

¶ 2. These appeals involve a dispute over insurance coverage related to an automobile accident involving vehicles driven by plaintiff Kelley A. Jackelen and defendant Hope Russell. Per the second amended complaint, on or about November 14, 2010, Russell and Jackelen were involved in a motor vehicle accident near 84th Street and Layton Avenue in Greenfield,

---

[1] In this case, we use the terms "summary judgment" and "declaratory judgment" interchangeably. The trial court's written decision and order states that it "GRANTS Allstate's motion for declaratory and summary judgment."

Hertz and Hope L. Russell appealed in case number 2014AP1883, and Artisan appealed in case number 2014AP2109. We entered an order dated April 20, 2015, consolidating these appellate cases for disposition pursuant to WIS. STAT. RULE 809.10(3) because they involve the same circuit court case and the same judgment is at issue in each appeal.

[2] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

Wisconsin.[3] Jackelen alleges that Russell was negligent in operating her vehicle and that as a result of Russell's negligence, Jackelen sustained significant damages and injuries.[4] The complaint additionally alleges that Allstate had issued a policy of liability insurance to Russell and her husband, Marion (Ryan) Russell, which was in full force and effect on November 14, 2010.[5]

¶ 3. At the time of the accident, Russell was driving home to Madison from General Mitchell International Airport in Milwaukee after a weekend trip to visit family in Kansas City. The vehicle she was driving at the time of the accident, a Chevy Traverse, was owned by Hertz, Ryan Russell's employer. Hope Russell was not renting the Hertz-owned vehicle at the time of the accident; rather, she was driving it pursuant to Hertz's employee vehicle use privilege policy, which allowed certain Hertz employees, including Ryan Russell, to drive Hertz vehicles home in the evenings and on weekends. Pursuant to the Hertz

[3] We describe the facts as alleged in the seconded amended complaint filed in the circuit court on January 15, 2013. Unless otherwise indicated, all references to the "complaint" refer to the seconded amended complaint, which was the operative complaint at the time of the trial court's order that is at issue in this appeal.

[4] To the extent the parties dispute the facts as to the underlying accident itself, those facts are not at issue on this appeal. We therefore consider only those facts relevant to the determination of insurance coverage pursuant to the terms of Allstate's policy.

[5] Mr. Russell's given name is Marion, although he goes by the name Ryan. We will refer to Hope Russell as either "Russell" or "Hope Russell," we will refer to Marion (Ryan) Russell as "Ryan Russell," and we will refer to Hope Russell and Ryan Russell collectively as "the Russells." Ryan Russell is not a party to the underlying action.

policy, an employee's spouse was authorized to drive the Hertz-owned vehicle on the employee's days off or while on vacation or on holidays, but the spouse's use was limited during the work week.

¶ 4. Russell testified at her deposition that she drove the Hertz vehicle to the airport so that she could park in the Hertz rental lot for free, so that she could save money on gas, and so that her husband would have use of the family's van for transporting their four children. Russell also testified that prior to the accident, the only other time she had actually driven the Chevy Traverse was on her way to the airport prior to her trip.

¶ 5. It is undisputed that Allstate had issued an automobile insurance policy to the Russells, which included coverage for certain non-owned vehicles, that was in effect on the date of the alleged accident. It is also undisputed that Hope Russell was an authorized user at the time of the accident, as the accident occurred on a Sunday and the Hertz policy specifically stated that an employee's spouse was authorized to drive Hertz-owned vehicles on the weekend. However, Allstate argues that there is no coverage under its policy because vehicles in Hertz's fleet were regularly available for the Russells' use.

¶ 6. The particular provision at issue identifies a non-owned auto that is insured under the Allstate policy as: "A non-owned auto used with the permission of the owner. This auto must not be available or furnished for the regular use of a person insured." The parties primarily dispute the meaning of the second sentence of that provision, particularly whether "[t]his auto" refers to the specific vehicle involved in the accident or rather to any non-owned vehicle, as well as whether "a person insured" refers to the insured per-

son involved in the accident (Hope Russell) or to all persons insured under the policy (Hope and Ryan Russell).

¶ 7. Based on this "drive other car" exclusion, *see Westphal v. Farmers Ins. Exch.*, 2003 WI App 170, ¶ 11, 266 Wis. 2d 569, 669 N.W.2d 166 ("the purpose of the drive other cars exclusion is to . . . exclude coverage of a vehicle that the insured owns or frequently uses for which no premium has been paid"), Allstate filed a motion for declaratory and summary judgment on January 14, 2014, seeking an order that no coverage exists for the motor vehicle accident involving the Chevy Traverse because the Russells' insurance policy excluded coverage for non-owned vehicles that were available for the Russells' regular use. Specifically, Allstate argued that no coverage exists because the vehicles in the Hertz fleet were available for the Russells' regular use as a result of Ryan Russell's employee use privileges.

¶ 8. The trial court heard oral argument on Allstate's motion and thereafter issued its written decision on June 9, 2014. In its written decision, the trial court granted Allstate's motion for declaratory and summary judgment, agreeing that there is no coverage under the Allstate policy.[6] In reaching its conclusion,

---

[6] The trial court's written decision also addressed Hertz's motion for declaratory judgment, which the trial court denied. Hertz's notice of appeal in 2014AP1883, filed on August 11, 2014, stated that Hertz was appealing both the trial court's final judgment as to Allstate and the trial court's non-final order denying Hertz's motion for declaratory judgment. Hertz's notice of appeal listed the Jackelens as respondents, and in an order dated December 3, 2014, we questioned whether the Jackelens were properly named as respondents because litigation between Hertz and the Jackelens was continuing in the trial court. We thereafter ordered Hertz to file a memorandum

the trial court explained that the purpose of the language at issue was "to exclude coverage when an insured can regularly use other vehicles," and the trial court emphasized that the vehicle Hope Russell was driving at the time of the accident "was part of a Hertz fleet from which vehicles were made available to their employee, Mr. Russell, and his spouse for their regular use pursuant to a Vehicle Use Privilege Agreement." (Emphasis omitted.) Final judgment dismissing any and all claims against Allstate was entered in the circuit court on July 29, 2014, and we now address whether the trial court properly applied the "drive other car" exclusion in concluding that there is no coverage under the Allstate policy.

## ANALYSIS

### I. Standard of Review

¶ 9. The appealing parties ask us to reverse the trial court's grant of declaratory and summary judgment in favor of Allstate, which disposed of all claims against Allstate. The appealing parties alternatively argue that the "drive other car" exclusion is invalid under Wisconsin law as a result of our supreme court's relatively recent decision in *Belding v. Demoulin*, 2014 WI 8, 352 Wis. 2d 359, 843 N.W.2d 373. We will address these issues in turn, and we begin by first addressing whether the "drive other car" exclusion in

addressing that issue, and after considering the parties' submissions, we concluded in an order dated January 22, 2015, that the Jackelens were not respondents to Hertz's appeal and that Hertz's appeal of the trial court's non-final order denying Hertz's motion for declaratory judgment was therefore not properly before this court. Therefore, we address only the appealing parties' appeal of the final judgment entered as to Allstate at this time.

the Allstate policy applies to preclude coverage for Hope Russell as a matter of law.

██

¶ 10. We review the trial court's grant of summary judgment *de novo,* and we apply the same methodology as the trial court. *See Young v. West Bend Mut. Ins. Co.,* 2008 WI App 147, ¶ 6, 314 Wis. 2d 246, 758 N.W.2d 196. Summary judgment is proper "if the pleadings and evidentiary submissions of the parties 'show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " *Id.* (citation omitted); WIS. STAT. § 802.08(2). A question of statutory construction is likewise a question of law we review *de novo. State v. Cole,* 2000 WI App 52, ¶ 3, 233 Wis. 2d 577, 608 N.W.2d 432.

██

¶ 11. This case also involves the construction of an insurance contract, which we review *de novo. See Farmers Auto. Ins. Ass'n v. Union Pac. Ry. Co.,* 2009 WI 73, ¶ 30, 319 Wis. 2d 52, 768 N.W.2d 596. "The same rules of construction that govern general contracts are applied to the language in insurance policies." *Folkman v. Quamme,* 2003 WI 116, ¶ 12, 264 Wis. 2d 617, 665 N.W.2d 857. We construe insurance policies "to give effect to the intent of the parties as expressed in the language of the policy." *Id.* We do this by giving the words in an insurance policy "their common and ordinary meaning, that is, the meaning a reasonable person in the position of the insured would have understood the words to mean." *State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 14, 275 Wis. 2d 35, 683 N.W.2d 75. A policy that is ambiguous concerning coverage is construed in favor of the insured. *Id.,* ¶ 15. "Language in an insurance policy is

ambiguous 'if it is susceptible to more than one *reasonable* interpretation.' " *Id.* (citation omitted). "Courts will interpret the words of an insurance contract against the insured when the insurer's interpretation conforms to what a reasonable person in the position of the insured would have understood the words to mean." *Id.*

■■

¶ 12. Additionally, "[t]here is an established framework for determining whether coverage is provided under the terms of an insurance policy." *Olson v. Farrar*, 2012 WI 3, ¶ 40, 338 Wis. 2d 215, 809 N.W.2d 1. We first examine whether the policy makes an initial grant of coverage. *See id.*, ¶ 41. If the initial grant of coverage is triggered by the claim, we next examine the various exclusions to determine whether they preclude coverage. *See id.* "If so, the court then determines whether there is an exception to the exclusion which reinstates coverage." *Id.*

> "Of primary importance is that the language of an insurance policy should be interpreted to mean what a reasonable person in the position of the insured would have understood the words to mean." If a word or phrase is susceptible to more than one reasonable interpretation, it is ambiguous. "[B]ecause the insurer is in a position to write its insurance contracts with the exact language it chooses—so long as the language conforms to statutory and administrative law— ambiguity in that language is construed in favor of an insured seeking coverage."

*Id.*, ¶ 42 (citations omitted; brackets in *Olson*). Furthermore, while "we must read insurance policies from the standpoint of a reasonable insured," *see Sobieski v. Farmers Ins. Exch.*, 181 Wis. 2d 324, 331, 510 N.W.2d 796 (Ct. App. 1993), "[w]e will not interpret a policy 'to

provide coverage for risks that the insurer did not contemplate or underwrite and for which it has not received a premium,' " *see Langridge*, 275 Wis. 2d 35, ¶ 15 (citation omitted).

## II. *The Allstate Policy*

¶ 13. It is undisputed that Allstate issued a policy of liability insurance to the Russells and that the policy was in effect on the date of the accident. It is also undisputed that the only vehicle listed on the Allstate insurance policy was the Russells' mini-van, a 2000 Oldsmobile Silhouette. This was the only vehicle the Russells owned, and the Russells never obtained private insurance coverage for the Hertz vehicles that Ryan Russell had access to as a result of his employment.

¶ 14. Per the terms of the Allstate policy, Allstate insured the vehicle named in the policy (the 2000 Oldsmobile Silhouette), and the policy also provided coverage for liabilities incurred while the Russells were driving certain non-owned vehicles as described in the policy. As previously explained, the Allstate policy defines "Insured Autos," in relevant part, as including: "A non-owned auto used with the permission of the owner. This auto must not be available or furnished for the regular use of a person insured." The parties do not dispute that Hertz owned the vehicle Hope Russell was driving at the time of the accident or that Hope Russell had permission to drive the Hertz vehicle at the time of the accident. Because there is no dispute that Russell was driving a non-owned vehicle with permission at the time of the accident, the coverage dispute centers on the second sentence of the policy language at issue, which excludes certain non-owned

autos driven with the owner's permission from coverage: "[t]his auto must not be available or furnished for the regular use of a person insured."

¶ 15. The appealing parties argue that the trial court's decision must be reversed because the "drive other car" exclusion does not apply and therefore coverage exists under the Allstate policy because the Chevy Traverse falls within the definition of "Autos Insured." According to the appealing parties, the "drive other car" exclusion does not preclude coverage because the vehicle Hope Russell was driving at the time of the accident—the Chevy Traverse—was not a vehicle that was regularly made available for her use. Allstate, to the contrary, argues that all Hertz vehicles must be considered in determining whether the "drive other car" exclusion applies and that the analysis must also include whether the Hertz vehicles were made available for Ryan Russell's regular use because he is also an insured under the Allstate policy.

¶ 16. We conclude that the proper analysis under the "drive other car" exclusion focuses on the specific vehicle for which coverage is being determined and that the "regular use" analysis looks to whether the specific vehicle was "available or furnished for the . . . regular use" of the insured driving that vehicle when the accident occurred.

*A. The "drive other car" exclusion requires a vehicle specific analysis.*

 

¶ 17. In construing the second sentence of the "drive other car" exclusion, the parties dispute whether the coverage analysis must focus on the Chevy Traverse or on the availability of the Hertz fleet

of vehicles as a whole. We give insurance contract language its common, ordinary meaning from the viewpoint of a reasonable insured, *Langridge*, 275 Wis. 2d 35, ¶ 14, and the specific sentence at issue states that "[t]his auto must not be available or furnished for the regular use of a person insured." We begin our discussion with the question of whether the coverage analysis is vehicle specific because in this case, the Chevy Traverse was one of many vehicles in the Hertz fleet. If the coverage analysis is vehicle specific, it is necessary to consider only whether the *Chevy Traverse* was "available or furnished for the regular use of a person insured." If the coverage analysis is not vehicle specific, however, the availability of the entire Hertz fleet must be considered.

¶ 18. We conclude that the "drive other car" exclusion clearly and unambiguously provides that the coverage analysis is specific to the vehicle for which coverage is sought, particularly as to the question of whether the Chevy Traverse was "available or furnished for the regular use of a person insured."[7] The phrase beginning with "[t]his auto" unquestionably modifies the clause's first sentence, which states that an auto insured under the Allstate policy includes "[a] non-owned auto used with the owner's permission." The only reasonable reading of the first sentence is that the auto referred to is the specific auto for which coverage is sought. Because "[t]his auto" refers to the specific vehicle identified in the first sentence, it necessarily follows that the phrase "[t]his auto must not be available or furnished for . . . regular use" refers to

---

[7] Hertz argues that the language is unambiguous, whereas the other appealing parties suggest that the language may be ambiguous. We agree with Hertz.

the specific, non-owned vehicle used with the owner's permission—here, the Chevy Traverse.

¶ 19. Allstate appears to recognize that the vehicle referred to in the first sentence of the "drive other car" exclusion is the specific vehicle being considered for coverage, as it states that "[w]hen this [vehicle specific] analysis is performed for the particular Chevy Traverse involved in the ... accident, the Chevy Traverse satisfies the first sentence ... because it was used with the owner Hertz's permission." Nevertheless, Allstate inexplicably argues that coverage is precluded because "as a particular, individual member of the Hertz fleet – it [the Chevy Traverse] had always been available for Ryan Russell's use." (Emphasis omitted.)

¶ 20. Allstate's argument is unavailing, as Allstate fails to account for the actual policy language at issue. As explained, the first sentence of the "drive other car" exclusion—which Allstate drafted—clearly identifies a specific vehicle: the non-owned automobile the insured drove with permission. The second sentence narrows the circumstances in which the vehicle identified in the first sentence is insured under the Allstate policy: when it is *not* "available or furnished for the regular use of a person insured." This language clearly and unambiguously indicates that the "regular use" analysis is specific to the vehicle for which coverage is sought, and Allstate fails to point to any language in its policy that suggests otherwise. Had Allstate intended the "regular use" analysis to apply to an entire fleet of vehicles rather than to a specific non-owned vehicle, it could have done so by drafting a more restrictive "drive other car" exclusion. It did not, and we will not do so on Allstate's behalf.

¶ 21. The cases discussing "regular use" also generally apply the regular use analysis to the specific vehicle for which coverage is sought, further bolstering our conclusion. For example, in *Hochgurtel v. San Felippo*, 78 Wis. 2d 70, 253 N.W.2d 526 (1977), the insured was driving a Ford truck that he did not own when he was involved in an accident, and the insurer argued that the trial court had erred in concluding that the *Ford truck* had not been " 'furnished or available' for [the insured's] 'regular use.' " *Id.* at 77, 81–82. Similarly, in *Westphal*, the court applied the "regular use" analysis to the specific vehicle involved in an accident and for which insurance coverage was thereafter sought. *See id.*, 266 Wis. 2d 569, ¶¶ 15–18.

¶ 22. Nothing in these cases suggests that the "regular use" analysis applies to any vehicle other than the specific vehicle for which coverage is sought. Accordingly, although Ryan Russell may have had access to any given number of non-owned vehicles as a result of his Hertz employment, we see no reason to depart from the vehicle specific analysis applied in a long line of cases applying the "regular use" analysis, particularly where, as here, the policy language clearly and unambiguously indicates that the "regular use" analysis is applied to the specific non-owned vehicle for which coverage is sought.

*B. The Chevy Traverse was not available or furnished for Hope Russell's regular use.*

¶ 23. Having concluded that the "drive other car" exclusion coverage analysis is vehicle specific, we look next to whether the specific vehicle—the Chevy Traverse—was "available or furnished for the regular use of a person insured." "The definition of 'regular use' has been considered by the Wisconsin courts in a

number of cases and '[n]o absolute definition has been or can be established.' Rather, the interpretation and application of the regular use provision depends on the particular facts and circumstances of each case." *Id.*, ¶ 16 (internal citation omitted; brackets in *Westphal*).

¶ 24. The facts underlying the cases interpreting the phrase "regular use" fall on a spectrum.

> "On each end of the spectrum are the easy cases. If the use of the auto is sporadic and rigidly restricted, there is coverage under the policy. At the other end of the spectrum are those cases in which the use is unqualified and continuous; in these cases the denial of coverage is obvious. The doubtful cases are those in the middle."
>
> Some of the "signposts" of "regular use" as set out in the cases are continuous use rather than sporadic use; frequent use rather than infrequent or merely casual use; unqualified use rather than restricted use; use for an indefinite period rather than a definite period; usual use rather than unusual use. Regularity of use is not diminished by the fact the vehicle is available for business use and not for personal use. If the employee's driving on the employer's business is a primary duty of the employee, the use is more apt to be considered "regular use[.]"

*Hochgurtel*, 78 Wis. 2d at 82 (internal citation omitted).

¶ 25. The facts of this case are somewhat unique given Ryan Russell's ability to use any number of cars from the Hertz vehicle fleet, and his access to the Hertz vehicles is at the center of the "regular use" analysis dispute. Allstate argues that the Chevy Traverse was available for the regular use of "a person insured" because the Hertz vehicles as a whole were available or

furnished for Ryan Russell's regular use—in other words, all of the Hertz vehicles are interchangeable and should therefore be treated as one for the purpose of determining coverage. As we have already explained, however, the "regular use" analysis is vehicle specific, and as we explain, the "regular use" analysis is applied as to the insured driving the vehicle at the time of the motor vehicle accident.

¶ 26. Actual use of a vehicle is an important consideration in determining whether coverage exists where a "drive other car" exclusion based on "regular use" is at issue; however, the "regular use" analysis is not limited only to consideration of the insured's *actual use* of the vehicle where the relevant policy language —like the Allstate policy at issue here—states that a non-owned auto used with permission is not insured under the policy if it is "*available* or *furnished* for . . . regular use." (Emphasis added.) In *Hochgurtel,* the insurer argued that the trial court had erred in "holding that the truck was not 'furnished or available' for [the insured's] 'regular use.' " *Id.* at 81. In considering the insurer's argument, the court noted that:

> The purpose of this policy provision is to provide coverage to the insured while he or she has only infrequent or merely causal use of a vehicle other than one described in the policy, but not to cover the insured . . . against personal liability with respect to the use of a vehicle which the insured frequently uses *or has the opportunity to do so* as that increases the risk to an insurance company without a corresponding increase in premium. The greatly added risk which insurers are unwilling to incur for a single premium is the multiplicity of potential liability situations where a non-owned vehicle is regularly used *or available for regular use.*

273

*Id.* (footnote omitted; emphasis added). Accordingly, a "regular use" analysis requires consideration of both availability for regular use *and* actual use.

¶ 27. We also conclude that the "regular use" analysis must be applied to the insured who was using the non-owned auto with the owner's permission at the time of the accident because the phrase "a person insured" as used in the Allstate policy is ambiguous. We reach this conclusion because "a person insured" is drafted in the singular and could therefore be reasonably interpreted to mean a single, specific insured, as the appealing parties suggest. However, because there are multiple named insureds under the Allstate policy, the phrase could also be reasonably interpreted as referring to any of the individuals insured under the policy, as Allstate suggests. Ambiguous policy language is interpreted in favor of the insured, *see Langridge*, 275 Wis. 2d 35, ¶ 15, and therefore "regular use" in this case must be analyzed as to Hope Russell alone.

¶ 28. Whether any given Hertz vehicle was ever available for Hope Russell's use, let alone actually used by Hope Russell, was entirely dependent upon which Hertz vehicle her husband brought home—if Ryan Russell did not bring a vehicle home, it was not available for Hope Russell's use. The parties do not dispute Ryan Russell's deposition testimony that he randomly selected a Hertz vehicle off the lot at the end of the day, that he usually selected a different vehicle each day, that he may have occasionally kept the same vehicle for a few days, and that if he ever took a vehicle home that he had previously driven, it was purely happenstance. The parties also do not dispute that the Hertz user policy required Ryan Russell to select a different vehicle at least once every five days, meaning

that the number of times Ryan Russell could even bring any given Hertz vehicle home was limited, and the parties do not dispute that the Hertz vehicles from which Ryan Russell could choose were limited to those vehicles not already rented out to customers. Thus, whether a vehicle was available for Hope Russell's use was further limited by what vehicles were available to Ryan Russell in the first place, which is a factor that was not foreseeable and was entirely out of the Russells' control.

¶ 29. The only reasonable inference that can be drawn from Ryan Russell's undisputed testimony is that prior to the weekend of the accident, Ryan Russell had, at most, brought the Chevy Traverse home on a few different nights. Because the Chevy Traverse could only be available to Hope Russell if Ryan Russell brought the Chevy Traverse home, no reasonable fact-finder could conclude that the Chevy Traverse was *available* for Hope Russell's regular use given that it had only been at the Russells' home, at most, no more than a few nights.

¶ 30. Likewise, no reasonable fact-finder could conclude that Hope Russell's *actual use* of the Chevy Traverse rose to the level of "regular use," as the parties do not dispute Hope Russell's deposition testimony that the only two times that she drove the Chevy Traverse were on the weekend of the accident. Moreover, applying the *Hochgurtel* "signposts" of "regular use" to Hope Russell's actual use of the Chevy Traverse clearly establishes that Hope Russell did not have "regular use" of the Chevy Traverse because: (1) Hope Russell could only use the Chevy Traverse if her husband brought the Chevy Traverse home, which occurred no more than a few nights total based on the undisputed deposition testimony;

275

(2) Hope Russell only *actually used* the Chevy Traverse to drive to and from the airport on the weekend of the accident; (3) Hope Russell's actual use of the Chevy Traverse was limited by the Hertz user agreement, which allowed her to use the Chevy Traverse only on weekends, holidays, and vacations; and (4) Hope Russell's actual use of the Chevy Traverse was further limited by her husband's discretion. Accordingly, Hope Russell's *actual use* of the vehicle cannot establish "regular use" within the meaning of Allstate's "drive other car" exception.

¶ 31. Consistent with the foregoing, we conclude that the trial court impermissibly broadened the scope of the "drive other car" exclusion by concluding that the "regular use" analysis must be applied to the entire Hertz vehicle fleet and that the "regular use" analysis must include Ryan Russell's access to the Hertz vehicles. Because we conclude that the "drive other car" exclusion does not apply to preclude coverage, summary judgment in favor of Allstate was not proper and we therefore reverse.

III. *Having concluded that the "drive other car" exclusion does not preclude coverage, we do not decide whether Belding renders the "drive other car" exclusion in the Allstate Policy invalid.*

¶ 32. Hertz and Russell alternatively argue that Russell is entitled to coverage because the "drive other car" exclusion in the Allstate policy is invalid under Wisconsin law.[8] Hertz and Russell rely on our supreme court's recent decision in *Belding*, in which the court

[8] Artisan does not raise this issue in its appeal. In its response to the Hertz and Russell briefs, Allstate argues that this issue is not properly before the court because it was not

sought to harmonize the "drive other car" exclusion permitted by WIS. STAT. § 632.32(5)(j) (2009–10) with the statutory prohibition on anti-stacking clauses in § 632.32(6)(d) (2009–10). In the context of that case, which involved an insured seeking to stack uninsured motorist coverage, the court stated that "[t]he drive-other-car exclusion permitted by WIS. STAT. § 632.32(5)(j) applies to 'any coverage.' " *See Belding,* 352 Wis. 2d 359, ¶ 40.

¶ 33. Hertz and Russell argue that the court's statement that WIS. STAT. § 632.32(5)(j) (2009–10) applies to "any coverage" renders the Allstate "drive other car" exclusion invalid because it does not comply with the statutory requirements. However, because we have already concluded that the exclusion at issue does not apply to bar coverage to Hope Russell in this case, we do not reach Hertz and Russell's alternative argument. *See CED Props., LLC v. City of Oshkosh,* 2014 WI 10, ¶ 18, 352 Wis. 2d 613, 843 N.W.2d 382.

---

raised before the trial court. Hertz concedes that it did not raise this issue at the trial court; however, Russell asserts that Artisan raised this issue before the trial court and that this issue is therefore properly before the court. Both Hertz and Russell also argue that regardless of whether this issue was raised before the trial court, it is properly before this court because it is purely a question of law, the relevant facts are not in dispute, the issue has been thoroughly briefed, and the question is one of sufficient public interest to merit a decision. *See City News & Novelty, Inc. v. City of Waukesha,* 170 Wis. 2d 14, 20–21, 487 N.W.2d 316 (Ct. App. 1992). We have reviewed the record, and counsel for Artisan did raise the applicability of WIS. STAT. § 632.32(5)(j) (2009–10) at oral argument before the trial court. We note, however, that the trial court did not address § 632.32(5)(j) (2009–10) in its written decision granting Allstate's motion.

*By the Court.*—Judgment reversed and cause remanded.